IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| GIVEFORWARD, INC., | * | |
| | * | |
| v. | * | Civil No. JFM-13-1891 |
| | * | |
| KENA HODGES | * | |
| | ****** | |

## MEMORANDUM

This case arises out of a fraudulent online fundraiser posted on a website that provides a platform for individuals seeking to raise money for family members or friends in need.  The website, GiveForward, brought suit against the subject of a fraudulent fundraiser, minor child "KDH," and his mother, seeking a declaration that GiveForward is not liable for any claims stemming from the fraud because they are entitled to immunity under the Communications Decency Act ("CDA"), 47 U.S.C. § 230.  (ECF No. 1).  The mother, Kena Hodges,[1] countersued (ECF No. 11), and also brought claims against the child's biological father, who created the fraudulent fundraiser (ECF No. 16), and his friend Catina Harris who assisted him.  (ECF No. 95).  I previously denied GiveForward's motion to dismiss on the basis of CDA liability (ECF No. 30) and bifurcated discovery—allowing only discovery on the issue of CDA immunity to go forward.  (ECF No. 78).  Currently pending before this court are Hodges' (ECF No. 110) and GiveForward's (ECF No. 118) motions for summary judgment on the issue of GiveForward's immunity and GiveForward's motion for summary judgment on Hodges' counter-claims.  *Id.*

---

[1] Throughout this memorandum I refer to defendant/counter-plaintiff as "Hodges."  This is meant to encompass Hodges individually and in her capacity as legal guardian of the minor child KDH.

## Background

In 2013, third-party defendant Kimani Johnson, with the assistance of Harris, posted a fundraiser on the GiveForward website claiming that Johnson's minor son KDH, then eight years old, was suffering from a heart condition that could become terminal and required surgery.  (ECF No. 11 at ¶¶ 14, 17, 18, 19).  Johnson does not have custody of KDH.  (ECF No. 11 at ¶ 4).  According to Hodges, they have an estranged relationship and "little to no interactions."  *Id.* at ¶ 5.  KDH does not suffer from a heart condition or health problems.  *Id.* at ¶ 19.

The fundraiser was open from March 19, 2013 to April 10, 2013 and raised $11,379.89.  (ECF No. 119 at p. 11).  GiveForward has an alert system in place to detect potentially fraudulent fundraisers and donations.  *See id.*  In short, the company receives automatic notifications when certain actions are taken, for example, when two donations are made by the same user on the same day, or when a donation larger than $1,500 is made.  *Id.*  Three of these notifications were triggered during the KDH fundraiser.  *Id.*  On April 24, 2013, Hodges learned about the fundraiser.  *Id.* at p. 12.  She immediately called GiveForward and notified GiveForward employee Caiti Stout that the fundraiser for KDH was fraudulent.  *Id.*  According to GiveForward, this call was received at or about the same time that GiveForward received internal alert notifications about the KDH fundraiser, and received notifications via Twitter to the same effect.  *Id.*  As a result of this information, GiveForward hid the fundraiser from public view and investigated the potential fraud.  *Id.*  GiveForward has since returned all funds from the KDH fundraiser to the donors.  *Id.*[2]

---

[2] Counsel for Hodges informed the court that in May 2015 Johnson pled guilty to theft charges associated with the fraudulent fundraiser in the Circuit Court for Prince George's County.  (ECF No. 135).

In response to communications between Hodges and GiveForward in which Hodges stated her intention to bring claims, (ECF No. 1 at ¶ 8), GiveForward brought this suit in June 2013.  GiveForward seeks a declaratory judgment stating that it is immune under Section 230 of the CDA from all possible state law claims that Hodges and KDH could bring relating to the KDH fundraiser.  *Id.* at ¶¶ 14–19.  Hodges subsequently brought a host of state law counter-claims against GiveForward,[3] and brought claims against third-party defendants Johnson and Harris.  (ECF Nos. 16, 95).

## STANDARD

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn from there in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Although the moving party bears the burden to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), the non-moving

---

[3] The state law claims against GiveForward are: intentional infliction of emotional distress, intentional misrepresentation, civil conspiracy, aiding and abetting, invasion of privacy – intrusion upon seclusion, invasion of privacy – unreasonable publicity given to private life, invasion of privacy – placing a person in false light, negligence, constructive fraud, abuse of process, violation of Maryland's Consumer Protection Act, Md. Code Ann., Com. Law § 13-301, violation of the Maryland Solicitations Act ("MSA"), Md. Code. Ann., Bus. Reg. § 6-601 *et. seq.*, and violation of the Telemarketing and Consumer Fraud Abuse Prevention Act, Md. Code. Ann., Com. Law § 14-3201.  (ECF No. 11).

3

party may not merely rest upon allegations or denials in pleadings, but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial.  Fed. R. Civ. P. 56(c)(1)(A).  A court should enter summary judgment where a non-moving party fails to make a sufficient showing to establish the elements essential to the party's claim and on which the party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.

If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted.  *See Anderson*, 477 U.S. at 248.  The court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).  Conversely, the motion should be denied if factual issues exist "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.

## ANALYSIS

### I.    Scope of Relief

To begin, there is a dispute about the scope of relief that GiveForward is seeking.  In her motion for summary judgment, Hodges argues that GiveForward is seeking a declaration that it is immune from all possible civil liability under the CDA.  (ECF No. 110 at p. 3) ("GiveForward asks this Court to decree that, pursuant to the CDA, GiveForward has blanket immunity from all state law causes of action for content provided by a third-party.").  In another motion before this court, however, GiveForward "unequivocally states" it is not seeking complete civil immunity, but only immunity on the state law claims Hodges has brought against it.  (ECF No. 107 at p. 19).  GiveForward also states this in its motion for summary judgment.  (ECF No. 119 at p. 48) (arguing that Hodges' characterization that "GiveForward is seeking a declaration of blanket immunity from all civil law suits" is "disingenuous").  Given that GiveForward explicitly

provides that it is only seeking immunity for the claims related to the KDH fundraiser, this is how I will construe their claim.

## II.     CDA Immunity

Section 230(c)(1) of the CDA states that "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[4]  47 U.S.C. § 230(c)(1).  Both parties argue that the inquiry for CDA immunity is a three-prong test and requires: 1) the party seeking immunity is an interactive computer service, 2) the claim is based on information provided by another information content provider, and 3) the claim treats the party as the "publisher or speaker of that information." (ECF No. 110 at pp. 32–33; ECF No. 119 at pp. 13–14).  It is not disputed that GiveForward is an "interactive service provider."  (ECF No. 119 at p. 14).  Accordingly, I consider the remaining two requirements in turn.

### a.  Information Content Provider

The statute provides that an "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  With the CDA, "Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009).  As a result, "[s]tate-law plaintiffs may hold liable the person who creates or develops unlawful content, but not the provider who merely enables that content to be posted online."  *Id.*  In other words, an interactive computer

---

[4] An additional portion of the CDA states that "[n]o cause of action may be brought and no liability may be imposed under any state or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

service may not be liable for certain content it "passively displays" but may be liable for other content that it is "responsible, in whole or in part for creating or developing." *Hare v. Richie*, Civ. ELH-11-3488, 2012 WL 3773116 (D. Md. Aug. 29, 2012) (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008)).

Hodges argues that GiveForward is an information content provider because of its influence over the fundraisers posted on its site. Hodges notes language from GiveForward's site that it is "more than just a website" to make a broad argument based on GiveForward's purpose. (ECF No. 110 at p. 37). Hodges claims that because GiveForward is a for-profit site that collects a portion of each donation made, and therefore offers support and tips to its fundraisers, it should be responsible for the content of the fundraisers. *See id.* (arguing that because "GiveForward helps users create fundraising pages, offers advice on how to craft the content of those fundraising pages, suggests ways to promote the fundraiser and increase donations, and processes donations" it is an information content provider).

Specifically, Hodges focuses on GiveForward's use of "fundraising coaches." Each newly-created GiveForward fundraiser is assigned a fundraising coach. *Id.* at p. 10. These coaches offer "fundraising tips and personalized suggestions" to fundraisers in order to boost the visibility of their cause and donations. *Id.* at p. 38. This advice largely comes in the form of emails sent from the fundraising coach. *Id.* Hodges focuses on the "suggested sample language and detailed instructions on how to write a compelling story" contained in emails sent by the coaches. *Id.*

GiveForward classifies its fundraisers into three distinct groups. *Id.* at pp. 8–9. Fundraisers involving the health of a child are automatically classified as "Green Light fundraisers." *Id.* This means that they receive "human support–in the form of technical support

and a fundraising coach–as well as the ability to be found on the website through search/browse." *Id.* at p. 9.  Hodges emphasizes this support, in particular, Erica Alhorn, the fundraising coach assigned to the KDH fundraiser, to make her argument.  Hodges alleges, relying on electronic records, that GiveForward, through Alhorn, sent twenty-four emails to Johnson and 156 to Harris during the pendency of the fundraiser.  (ECF No. 110 at p. 19) (citing ECF No. 110 exhs. A, G).  These contained "tips for how to improve the KDH fundraiser and maximize donations." *Id.* at p. 48.  According to Hodges, "Johnson and Harris opened and read these emails and followed the instructions contained therein to shape the content of the KDH fundraiser." *Id.*  Hodges also argues that "Johnson and Harris relied on the advice in GiveForward's publicly available fundraising guides." *Id.*

GiveForward disputes these facts.  (ECF No. 119 at pp. 31, 41).  GiveForward cites the deposition testimony of Johnson and Harris, both of whom stated that they did not have any contact with anyone at GiveForward during the creation of the fundraiser.  (ECF No. 119 at p. 31) (citing ECF No. 119 exh. H, Johnson Dep. 103:4-104:8; ECF No. 119 exh. E, Harris Aff. at ¶ 7).  According to Harris, while GiveForward's fundraising coach sent her emails with tips "[a]t no time did I contact the fundraising coach" and "[t]hese emails did not require me to do anything."  (ECF No. 119 exh. E at ¶ 10).  Johnson stated that he only had recollection of one email, he never responded to any of the emails, and he deleted them upon receipt.  (ECF No. 119 exh. H, 104:10-105:16).

GiveForward also argues that Hodges misconstrues the role of the fundraising coaches.  According to GiveForward, after the fundraiser is created, an email is sent to its creator, welcoming the person to GiveForward and assigning them a fundraising coach.  (ECF No. 119 at p. 42).  These emails are automatically generated.  *Id.*  GiveForward argues that the fact that

these emails were sent after the creation of the GiveForward fundraiser indicates that they had no

bearing on the content created by Johnson and Harris.  *Id.*  Additionally, GiveForward cites

Alhorn's declaration, where she states "neither Mr. Johnson nor anyone else affiliated with the

fundraiser ever contacted me prior to or during the time the KDH fundraisers were active."

(ECF No. 119 exh. C at ¶ 8).[5]  GiveForward argues that the only direct contact it had with either

Johnson or Harris during the creation and duration of the fundraiser were two occasions when

Harris called GiveForward concerning the process of receiving payment.  (ECF No. 119 at p.

43).

I find that there is not a genuine dispute of material fact concerning GiveForward's role

as an information content provider.  There simply is no evidence that GiveForward created the

content at issue in this case.  First, I reject Hodges' suggestion that the general purpose and form

of the GiveForward website makes it an information content provider.  I recognize that in

contrast to other websites that solely provide a forum for third-parties to post information,

GiveForward has an interest in the content posted on its site because it takes a share of the profits

made from each fundraiser.  However, this interest does not translate into GiveForward creating

---

[5] Hodges has filed a motion to strike this affidavit (ECF No. 130), and has also filed motions to
strike the affidavits of Caiti Stout (ECF No. 130) and Ethan Austin (ECF No. 129).  Hodges
argues that portions of Austin's affidavit are legal conclusions and not made on personal
knowledge.  I do not rely on Austin's affidavit in today's opinion and deny the motion to strike.
The other motion appears to be the result of a contentious discovery dispute between the parties.
Hodges moves to strike the affidavits of Stout and Alhorn because she was claims she was
unable to depose them due to GiveForward's lack of cooperation (ECF No. 130 at p. 3–4).
GiveForward disputes this characterization (ECF No. 134 at p. 3).  In the alternative, Hodges
argues that portions of the Alhorn and Stout affidavits should be stricken because they contain
inadmissible statements.  (ECF No. 130 at p. 4–7).  I recognize that it would have been
preferable if the parties agreed to a resolution that permitted the depositions of Alhorn and Stout.
Nonetheless, I do not find that Hodges has shown sufficient cause to strike the affidavits and
deny the motion.  I also note that although I rely in part on Alhorn's statements to reach my
conclusion about GiveForward's status as an information content provider, the statements are not
dispositive—I find that the statements of Harris in her declaration and Johnson in his affidavit,
which are not objected to, are more persuasive.

content for each fundraiser—rather GiveForward provides a forum and gives helpful hints and suggestions to forum posters.

I also am not persuaded by Hodges' specific evidence with regard to the KDH fundraiser. Hodges offers electronic evidence to show that Johnson and Harris read a large quantity of emails sent by GiveForward and then claims that "Johnson and Harris opened and read these emails and *followed the instructions contained therein to shape the content of the fundraiser*." (ECF No. 110 at p. 48) (emphasis added).  While Hodges does offer evidence alleging that the emails were sent and opened, she does not offer any evidence to show how they influenced the content at issue.  And both Johnson and Harris, under oath, stated that the emails had no effect on the fundraiser.  (ECF No. 119 exh. H, 103:4-104:8; ECF No. 119 exh. E at ¶ 7).

Even assuming, however, that Harris and Johnson were persuaded by the automated emails they received containing tips to improve their fundraiser and fundraising guides offering similar suggestions available on the GiveForward site, this would not make GiveForward a content provider.  For one, the tips cited by Hodges primarily deal with the dissemination of the fundraiser—not the type of story posted.  For example, they advise fundraisers to make a donation themselves or have close friends or family make a donation early on in order to "get the ball rolling."  *See* (ECF No. 110 at pp. 12–13).  The tips also encourage fundraisers to share the fundraiser on social media.  *Id.*  These tips do not shape the content posted by the fundraisers— and in this case, did not specifically contribute to the false content at issue—Harris' and Johnson's fraudulent narrative that KDH had a heart condition.  The tips instead addressed the dissemination of the fundraiser, not its content.

My ruling accords with the other decisions in this Circuit regarding the scope of the definition of an information content provider.  The Fourth Circuit has previously found that

Consumeraffairs.com, a website "that allows consumers to comment on the quality of businesses, goods, and services" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 252 (4th Cir. 2009), was not an information content provider with respect to negative comments posted on its site about a car dealership. *Id.* at 260. The court rejected an argument that the "structure and design" of the website made it an information content provider. *See id.* at 256–58. Specifically, the party suing Consumeraffairs.com sought to prove that the website's design and function, which encouraged consumers to post complaints about businesses, and allegedly steered those complaints into categories designed to attract the attention of class-actions lawyers, made the site an information content provider. *Id.* at 256–57. The court held that even "accepting as true all of the facts" pled, there was no evidence "that Consumeraffairs.com contributed to the allegedly fraudulent nature of the comments at issue." *Id.* at 257. Crucially, the allegations did not show that "any alleged drafting or revisions by Consumeraffairs.com was something more than a website operator performs as part of its traditional editorial function." *Id.* at 258. My reasoning tracks the Fourth Circuit in *Nemet*. As in that case, there is no evidence here that GiveForward was involved in the drafting or revising of the fraudulent content.

In reaching its holding in *Nemet*, the Fourth Circuit relied on an earlier CDA case, *Zeran v. American Online, Inc.*, 129 F.3d 327 (4th Cir. 1997). In *Zeran*, the court found that AOL had immunity under the CDA for defamatory speech posted on AOL message boards by a third party. *See id.* at 332. The post alleged that the plaintiff was selling highly offensive t-shirts, which resulted in the plaintiff receiving a large volume of harassing and threatening communications. *Id.* at 329. The plaintiff argued that AOL should be liable for failing to take down the content as soon as he notified them that it was false, for failing to notify subscribers

that the message was false, and for failing to screen future defamatory material. *Id.* at 328.  The court stated that § 230, "[b]y its plain language . . . creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service," *id.* at 330, and held that AOL qualified for its protection. *Id.* at 332.  Again, the court focused on the origin of the language at issue, and found that the plaintiff could not attribute language not created by AOL to it. *See id.* at 332–33.  I reach the same conclusion here.

In a more recent case, one of my colleagues found that a website operator was an information content provider. *See Hare v. Richie*, Civ. ELH-11-3488, 2012 WL 3773116 (D. Md. Aug. 29, 2012).  The site, "thedirty.com," serves as a forum for "intel, opinions, gossip, satire, and celebrities." *Id.* at *1.  The site contains sections for different geographic areas and users are encouraged to post about people within their area. *Id.* at *2.  The site's creator and employees select user-submitted posts for publication. *Id.* at *1.  The site's founder then publishes the selected posts and adds an "editorial comment" in bold to the bottom of each. *Id.* at ** 1, 2.

The court found that, given the founder's editorial comments on each post, he and the site were, at least with respect to those comments, information content providers. *Id.* at ** 17–18.  The court recognized that "[i]f Dirty World's involvement with the postings were limited to the decision whether to publish user-supplied content, it would clearly be entitled to immunity under § 230 (c)(1)." *Id.* at *17.  The editorial comments, some of which were potentially defamatory, pushed the needle in the plaintiffs' favor. *See id.*  Given that they were provided by the founder of the website, the court found that the site "had some role in writing or editing the material" and

thus was not entitled to immunity.  *Id.* (internal citation omitted).[6]  I find this holding consistent

with my own today because Hodges has not presented any evidence that GiveForward edited, or

added to, the fraudulent fundraiser posted by Johnson and Harris.

Accordingly, I find that GiveForward is not an information content provider of the text

posted on GiveForward's website by Johnson and Harris.[7]  As a result, I also find that

GiveForward is immune from claims *stemming from this text*.[8]

### b.  Publisher or Speaker

My finding that GiveForward is not an information content provider protects

GiveForward from liability for claims based on the text of the fundraiser posted by Johnson and

Harris.  However, the CDA only protects a website from liability for claims that "treat it as the

---

[6]  The same website was granted immunity by the Sixth Circuit.  *See Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014).  In *Jones* the Sixth Circuit found that thedirty.com did not materially contribute to the content and rejected a theory that imposed liability whenever an "interactive computer service provider adds commentary to third-party content that 'ratifies or adopts' that content."  *Id.* at 415 (internal citation omitted).  Importantly, the court in *Jones* reached its conclusion in part because the plaintiff did not allege that the added comments were defamatory themselves.  *Id.* at 416.

[7]  Both parties each also cite to a Ninth Circuit decision, *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008), as support for their respective arguments.  Although not binding on my decision, I agree with GiveForward that the reasoning in *Roommates* bolsters its argument.  In *Roommates*, the Court held that a website which allowed users to solicit potential roommates, and, as a condition of use, required users to input preference information that violated fair housing laws (ex. the desired gender, race, and sexual orientation of a roommate), was an information content provider.  The court found that because the site "makes answering the discriminatory questions a condition of business . . . . it is no stretch to say that the enterprise is responsible, at least in part, for developing that information."  *Id.* at 1166.  This scenario is quite distinct from GiveForward—a website that encourages a perfectly legal activity and does not make the ability to post conditional on violating the law.

[8]  I find that this includes all state law claims except the abuse of process, negligence, and MSA claims.  These claims, as well as portions of the intentional infliction of emotional distress claims and the invasion of privacy claims that are not based on this text, are addressed below.

publisher or speaker" of content provided by an independent information content provider.[9]  As a result, GiveForward can be liable for independent actions it took distinct from the fraudulent text.

GiveForward strenuously argues that almost all of Hodges' claims are premised on the fraudulent fundraiser post.  The state law claims against GiveForward are: intentional infliction of emotional distress, intentional misrepresentation, civil conspiracy, aiding and abetting, invasion of privacy – intrusion upon seclusion, invasion of privacy – unreasonable publicity given to private life, invasion of privacy – placing a person in false light, negligence, constructive fraud, abuse of process, violation of Maryland's Consumer Protection Act, Md. Code Ann., Com. Law § 13-301, violation of the Maryland Solicitations Act ("MSA"), Md. Code. Ann., Bus. Reg. § 6-601 *et. seq.*, and violation of the Telemarketing and Consumer Fraud Abuse Prevention Act, Md. Code. Ann., Com. Law § 14-3201.  (ECF No. 11).  Hodges argues that at least some of these are not premised on treating GiveForward as a publisher or speaker.

First, Hodges argues that GiveForward's liability stems not from its role as a publisher, but from its position as a "professional fundraiser" under the MSA.  (ECF No. 110 at p. 46). Hodges argues that as a professional fundraiser, GiveForward is required to abide by the regulations set forth in the MSA, and it did not with the KDH fundraiser.  *Id.* at 46–48.  Hodges

---

[9] I recognize that despite the statutory language, courts within this Circuit have not independently focused on if the claims treat the party seeking immunity as a "publisher or speaker" of the information at issue.  *See e.g., Hare v. Richie*, Civ. ELH-11-3488, 2012 WL 3773116 (D. Md. Aug. 29, 2012).  Rather, this question is typically folded into the inquiry of whether or not the party is an information content provider.  *See Zeran v. American Online, Inc.,* 129 F. 3d. 327, 330 (4th Cir. 1997) ("§ 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role.  Thus lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content are barred.").  In these cases, however, the claims against a party seeking immunity were typically for defamation—which obviously seeks to treat the party seeking immunity as a "publisher or speaker."  Given this distinction, and the attention paid to this issue by the parties in their briefs, I consider this element independently.

uses this alleged breach as the basis of her claim under the MSA.[10]  Hodges also makes a general

claim that "professional fundraisers have a duty not to make misleading statements and verify the

legitimacy of the fundraiser it is promoting" without citing any legal authority.  *Id.* at p. 44.

This appears to be the basis of her constructive fraud claim.[11]  Hodges' negligence claim is based

on violations of both the MSA and this other duty.[12]

Second, Hodges points to speech directly attributable to GiveForward about the KDH

fundraiser, and argues that it, rather than the text posted by Johnson and Harris, is the basis of

her claims.  In making this argument, Hodges embraces an inclusive definition of speech, that

includes "clicks, button-pushes, automated emails, 'likes' or 'hugs,' and similar such actions and

activities that are conducted online electronically."  (ECF No. 128 at p. 15).  The specific

"tortious content and conduct created and/or developed by GiveForward" that Hodges identifies

are: a tweet tweeted from a GiveForward employee promoting the KDH fundraiser, widgets

---

[10] Hodges' claim alleges violations of Md. Code. Ann., Bus. Reg. §§ 6-607, 6-608, 6-610.  To
support this, Hodges alleges that "GiveForward failed to perform even a cursory review of
Johnson's fundraiser, and helped develop and facilitated the fraudulent fundraiser on
GiveForward's website" and GiveForward "fail[][ed] to exercise due diligence in the
management of their website."  (ECF No. 11 at ¶¶ 135, 136).  These actions amount to "a
practice that by affirmative representation or by omission is misleading."  *Id.* at ¶ 135.

[11] Hodges alleges in support of her claim for constructive fraud that "GiveForward breached the
duties owed to its donors, customers, and the general public, with reckless disregard for their
confidence, by fraudulently seeking donations for a surgery it claimed was needed by a
terminally ill child, who is, in reality, perfectly healthy" and that "GiveForward breached the
duties owed to KDH, an individual displayed on its website to solicit donations and profits for
Counter-Defendant, by using KDH's name and likeness fraudulently for financial gain."  (ECF
No. 11 at ¶¶ 103, 104).

[12] In her counter-complaint, Hodges argues that "GiveForward owes a duty of care to
individuals, including KDH, whose image and personal information are used on GiveForward's
website to generate funds for both the fundraiser and GiveForward, to take reasonable care to
insure the material posted on GiveForward's website is truthful."  (ECF No. 11 at ¶ 93).  In her
memorandum in opposition to GiveForward's motion for summary judgment and reply in
support of her own motion, Hodges argues that "GiveForward's violations of the MSA are proof
of its negligence."  (ECF No. 128 at p. 44).

provided on the GiveForward website,[13] and thank you emails automatically sent to donors to the

KDH fundraiser.  (ECF No. 128 at pp. 24–25).[14]  Hodges appears to argue that these activities

can serve as the basis for her emotional distress and invasion of privacy claims.  *See id.* (noting

that each instance of GiveForward-created content invaded KHD's privacy and caused emotional

distress).

Hodges last point is closely related to the second—she argues that her claims are not

based only on the false claim that her son was sick, but on the repeated publication on the

internet.  This theory hinges on GiveForward's role "[i]n helping to increase the success of the

KDH Fundraiser . . . [which] increased the invasion of privacy and emotional distress."  *Id.* at p.

20.  This is because "[e]verything that GiveForward did to increase the success of the KDH

Fundraiser resulted in more people seeing the fundraiser, and the more people seeing the

fundraiser, the greater the invasion of privacy."  *Id.*

I reject these three arguments.  At the outset, I note that I am suspect of this entire line of

reasoning.  In effect, these arguments are an attempt to sidestep the CDA by focusing on conduct

supposedly "independent" of the fraudulent post by Johnson and Harris.  However, without the

post, all the claims in this suit would not have existed—making their supposed distinction

---

[13]  According to Hodges, a widget is a mechanism "that allow users to post a snapshot of a
GiveForward [fundraiser] to an external website, such as a blog."  (ECF No. 110 at p. 39); *see
also* (ECF No. 110 at ¶¶ 27–32).

[14]  In her chart depicting GiveForward's tortious conduct, Hodges also includes "fundraising tips
email; fundraising advice resources; fundraising coaching" and "affirmative representations
regarding safety of GiveForward fundraisers."  (ECF No. 128 at p. 27–28).  The former is
considered in the portion of this opinion addressing GiveForward's status as an information
content provider and the latter is discussed with regards to the MSA.  For this reason, I do not
discuss them here.  And, although Hodges indicates that the "chart is not intended to be an
exhaustive list of GiveForward created content," the items listed in the chart are the only ones
she identifies and are therefore the focus of my opinion.

tenuous at best.  Nonetheless, I decline to extend the scope of the CDA unnecessarily and will rule on these claims as if they were independent.

According to Hodges, "GiveForward is a fund-raising counsel, professional solicitor, and charitable solicitor" as defined by the MSA.  *Id.* at p. 35.  As such, GiveForward is subject to the same regulations as "traditional, brick-and-mortar" fundraisers in the state.  *Id.*  Hodges cites portions of the MSA that prohibits charitable groups from engaging in false or misleading fundraising activities.  *Id.* at p. 36 (citing Md. Code. Ann., Bus. Reg. § 6-608(a)).  Hodges then argues that a slew of GiveForward's actions violated the MSA, specifically: the claims on its website that GiveForward is "quick, easy, and secure" and "there's no need to worry when creating or giving to a fundraiser," GiveForward's statement to CNN Money that "GiveForward assigns a live 'fundraising coach' to each campaign, who both vets and guides the efforts," and GiveForward's claim on its online support center that it "makes every effort to investigate suspect fundraisers . . . [and] has a due diligence process."  *Id.*

GiveForward's response is two-fold.   GiveForward argues that Hodges' claims cannot lie because the Maryland Solicitations Act does not create a private right of action.  (ECF No. 119 at pp. 16–22).  Second, GiveForward claims that even if it did, Hodges has not alleged violations of it.  *See id.* at pp. 25–29.  Specifically, GiveForward argues that any fraud based claims fail because Hodges has not demonstrated reliance on a false statement.  *Id.*

I decline to reach the Maryland state law question of whether or not the MSA provides a private cause of action.  I find that, even assuming that a private individual can bring a claim under the MSA, GiveForward is entitled to summary judgment on Hodges' claim.  Hodges argument for a violation of the MSA focuses on statements on its website and other platforms concerning the veracity of its fundraisers.  I note first that these statements did not make specific

promises and/or are taken out of context.[15]   Even more importantly, however, is the fact that the

statements—when they make affirmations concerning the veracity of their fundraiser—make

them to a group that Hodges is not a part of—donors to the various fundraisers promoted on the

site.  *See* (ECF No. 119 at p. 28) (the answer to a "frequently asked question" which states "[t]his

is a great question, *because as a donor*, you can never be too cautious") (emphasis added).   The

statements assure donors that if they make a contribution, it will likely go to a legitimate

fundraiser that is what it purports to be, but provide that GiveForward cannot guarantee this.  *Id.*

("GiveForward makes every effort to investigate suspect fundraisers, but unfortunately, we

cannot claim responsibility for the accuracy of each fundraiser.").   Hodges and KDH were not

donors to this particular fundraiser.   Rather, KDH was the subject of it.   Accordingly, I find that

there is no evidence of misleading or deceitful behavior that supports a MSA claim, and on this

claim, GiveForward is entitled to judgment as a matter of law.

     For the same reasoning, I grant GiveForward's motion for summary judgment on

Hodges' claims for constructive fraud and negligence.   "Constructive fraud is a breach of legal or

equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares

fraudulent because of its tendency to deceive others, to violate public or private confidence, or to

injure public interests."  *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 652 A.2d 1117, 1127 n.11

(1995) (internal quotation and citation omitted).   To prove negligence in Maryland, a plaintiff

must show, "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that

the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that

---

[15] For example, the statements that GiveForward is "quick, easy, and secure" and "there is no
need to worry" do not make affirmative representations.  The statements "GiveForward makes
every effort to investigate suspect fundraisers . . . . GiveForward has a due diligence process" are
in two separate paragraphs that warn donors that GiveForward "cannot claim responsibility for
the accuracy of each fundraiser."  (ECF No. 119 at p. 21).

the loss or injury proximately resulted from the defendant's breach of the duty." *Valentine v. On Target, Inc.*, 353 Md. 544, 727 A.2d 947, 949 (1999) (internal quotation and citation omitted). Both of these torts require a breach of a duty.  Hodges is unable to show that the statements on GiveForward's website created a duty to check the veracity of fundraisers in order to protect the recipient of the fundraising effort.[16]

I am also not persuaded by Hodge's argument concerning the additional "content" it created in the form of a tweet, widgets, and thank you emails sent to donors.  The tweet and the widgets were both used by GiveForward to further share the KDH fundraiser.  According to Hodges, the tweet, which thanked a supporter for donating to the KDH fundraiser, was "itself an invasion of KDS's privacy and . . . furthered other invasions of KDH's privacy by increasing the dissemination and success of the fraudulent fundraiser."  (ECF No. 128 at p. 24).  Hodges makes the same claim about the widgets.  *Id.* at 24–25.  The thank you emails, she asserts, were only a violation via their promotion of the fundraiser.  *Id.*

The tweet cannot support a claim for emotional distress or invasion of privacy.  For one, the tweet would not have existed but for the content posted by Johnson and Harris, third-party information content providers.  Moreover, GiveForward cannot be liable for claims based on content created by another source.  The tweet's short message simply thanked a twitter user for sharing the story of KDH.[17]  It did not add additional information, or make any unique or independent statements about KDH.  The widget is also not independently tortious—it does not

---

[16] I also note that in this instance, the group that GiveForward may have a duty to—the donors—were protected.  Once it was revealed that the fundraiser was fraudulent, their donations were returned.  (ECF No. 119 at p. 12) (citing ECF No. 119 exh. D, Stout Aff. at ¶ 13).

[17] The Tweet in full reads "@mr_carter93 Thank you for sharing [KDH's] story! You are making a difference #giveforward."  (ECF No. 110 at p. 16).  Presumably, @mr_carter93 is a twitter user who shared the link to/and or donated to the KDH fundraiser.

contain any text, and is only a vehicle through which the KDH fundraiser website could be shared.

Hodges' alternative theory, that the tweet, widget, and thank you emails were tortious because they further disseminated the fraudulent message, is also not viable.  GiveForward points to an early case addressing the CDA, in which the Fourth Circuit declined to find that there was a difference between a "publisher" and a "distributer" of content for purpose of immunity.  *Zeran*, 129 F. 3d. at 332.  Hodges argues that she is not only suing GiveForward for its publishing of the content, but for its distribution of it on independent platforms, i.e. social media, twitter, and additional emails.  On this point, I find *Zeran* instructive and decline to find that Hodges' distinction between publishing and distributing the fundraiser carries legal significance under the CDA.  Doing so would be inconsistent with its purpose.  *See Zeran*, 129 F. 3d at 330 ("The purpose of this statutory immunity is not difficult to discern. . . . Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.").

Additionally, I do not find that the promotion of the site is sufficient to make out a claim for intentional infliction of emotional distress or invasion of privacy.  The core injury that Hodges is alleging—with both torts—is that false information about the medical status of her son was posted on the internet.  This injury occurred at the moment that Hodges and Johnson posted the fundraiser on the GiveForward site.  GiveForward's tools only enabled Johnson to increase the audience of the fraud, and this was done without GiveForward's knowledge that the fundraiser was fraudulent.

I grant GiveForward's motion for summary judgment on these claims.

### III.    Abuse of Process Claim

Hodges also brings a claim for abuse of process.  Hodges' claim centers on communications between the parties prior to GiveForward's commencement of this suit. According to Hodges, "[b]y contacting GiveForward and notifying it of Johnson's fraudulent fundraising scheme, and by asking GiveForward to return its profits to the donors . . .[she] notified and 'called out' the company on its fraudulent activities."  (ECF No. 11 at ¶ 111). Hodges then alleges that as punishment, "GiveForward surreptitiously sued" her "even though the parties were contemporaneously negotiating settlement."  *Id.* at ¶ 112.  In her motion, Hodges also alleges that counsel for GiveForward violated the Rules of Evidence by, in its complaint for declaratory relief, citing "settlement negotiations" between the parties—identified as letters sent by counsel for Hodges to counsel for GiveForward before the suit was filed.  (ECF No. 128 at p. 47) ("Under the guise of engaging in settlement negotiations, GiveForward deceptively requested a written settlement demand from Ms. Hodges and KDH in order to improperly file the same with the Court . . . . GiveForward did, in fact, use Ms. Hodges and KDH's written settlement demand to support its issue of process herein.").

Under Maryland law, the "essential elements of abuse of process are (1) an ulterior motive, and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding."  *Cottman v. Cottman*, 56 Md. App. 413, 468 A.2d 131, 140 (1983) (internal citation omitted).  The tort is only viable where there has been a "perversion of court process to accomplish some end which the process was not designed to accomplish."  *Barnes v. Montgomery Cnty., Md.*, 798 F. Supp. 2d 688, 693 (D. Md. 2011) (internal citation omitted). Hodges is essentially arguing that GiveForward's bringing of this suit is itself an abuse of process.  This argument is nonsensical given that GiveForward is bringing suit for a declaratory

judgment, a perfectly permissible vehicle of relief.  GiveForward is doing precisely what the declaratory act permits—seeking that the court "declare[s] the rights and other legal relations of any such interested party."  28 U.S.C. § 2201.  Hodges' emphasis on "settlement negotiations" between the parties also lacks merit.[18]  Accordingly, I grant GiveForward's motion for summary judgment on this claim.

### IV.    Additional Pending Motions

Also pending is Hodges' motion for costs, including attorneys' fees, on the basis of alleged discovery violations committed by GiveForward.  (ECF No. 103).  Hodges claims that GiveForward unnecessarily delayed in its production of a manual, entitled "Fundraising Coach Bootcamp," that is used to train GiveForward fundraising coaches.  *Id.* at p. 3.  This document was produced on January 23, 2015, after the close of discovery.  *Id.* at p. 2.  According to Hodges, counsel for GiveForward has "fail[][ed] to explain why this highly relevant and discoverable document was not identified or produced" prior to this time.  *Id.* at p. 14.  Hodges argues that the delay "materially prejudiced" her "ability to conduct further discovery."  *Id.* at p. 15.  GiveForward disputes that it was uncooperative (ECF No. 107 at pp. 5–13), and argues that the material at issue is outdated and not relevant.  *Id.* at pp. 13–15.

I realize that GiveForward delivered these materials later than the discovery deadline and did not produce them when discovery requests sought information that they may have contained. I do not condone this behavior.  It appears, however, that GiveForward's counsel acted appropriately by diligently seeking the documents, and after obtaining the materials, turning

---

[18] Hodges points to Federal Rule of Evidence 408, which bars admission of compromise offers and negotiations to "prove or disprove the validity or amount of a disputed claim."  Fed. R. Evid. 408.  This Rule is not relevant because GiveForward is not seeking that these letters be admitted into evidence nor is GiveForward using the letters to prove liability or the amount of a claim.

them over to Hodges and offering to accommodate the delay with additional discovery time. *Id.* at pp. 10–12.  Given this, I decline to impose sanctions or order the payment of costs under Fed. R. Civ. P. 37.  GiveForward's conduct was not repeated, nor done in bad faith.  The motion is denied.

I grant Hodges' outstanding motions to seal, ECF Nos. 85 and 90, as they are unopposed and appear meritorious.  I also grant the motions to serve process on Harris with alternative methods.  (ECF Nos. 127, 131).  I recognize that the deadline extension sought (ECF No. 131) has expired.  I grant an additional thirty day extension from today's date.

## CONCLUSION

For the aforementioned reasons, GiveForward's motion for summary judgment (ECF No. 118) is granted, and declaratory relief is entered in their favor as outlined above.  I also grant GiveForward summary judgment on all of Hodges' counterclaims against it.  GiveForward is dismissed from the case.  I deny Hodges' motion for costs (ECF No. 103) and the motions to strike (ECF Nos. 129 & 130).  The remaining motions to seal (ECF Nos. 85 & 90) and Hodges' motions concerning process (ECF Nos. 127 & 131) are granted.  A separate order follows.

|   08/06/2015   | /s/ |
|:---:|:---:|
| Date | J. Frederick Motz |
|  | United States District Judge |